## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RAYMOND WARREN MATHIS,                          *
    *DOC #462742, SID #2957325*,

                                      *

Plaintiff,

                                      *

v.                                              *        Civil Action No. ELH-18-223

                                      *

SOMERSET COUNTY DETENTION
    CENTER,                                     *
WARDEN HICKMAN,
CO II RICK KATO,                                *
CO II BAHAMONDE,
CO II TORNEY,                                   *
OFC. MATTHEWS,
                                      *

Defendants.

                          ***

## MEMORANDUM OPINION

The self-represented plaintiff, Raymond Warren Mathis, an inmate currently incarcerated at Roxbury Correctional Institution in Hagerstown, Maryland, filed suit pursuant to 42 U.S.C. § 1983 against defendants Somerset County Detention Center ("SCDC"); Warden Louis A. Hickman; CO II Rick Kato; CO II Pedro J. Bahamonde; CO II An Taun Torney; and Ofc. David Matthews. ECF 1. In his unverified Complaint, Mathis claims that when he was being held at SCDC, defendants used excessive force against him by tasing him without warning, banging his head into the wall and floor, and beating him while his hands were cuffed. *Id.* Mathis also claims that Warden Hickman discriminated against him. *Id.* He seeks monetary damages and asks the court to impose sanctions on the individual defendants. *Id.* at 7.

On April 30, 2018, defendants moved to dismiss or, alternatively, for summary judgment. ECF 12. Mathis responded on May 15, 2018. ECF 14. However, because defendants submitted unsigned affidavits in support of the original motion, the court denied their motion, without

prejudice, subject to renewal upon the submission of signed affidavits. ECF 16.

On July 27, 2018, defendants filed a "Renewed Motion To Dismiss or, Alternatively, For Summary Judgment" (ECF 17). It was supported by a memorandum (ECF 17-1) (collectively, the "Motion") and 30 exhibits. Mathis responded on January 18, 2019. ECF 25. No reply was submitted.

By Order dated February 8, 2019, the court again denied defendants' Motion, without prejudice, and subject to renewal upon submission of video footage of the incidents giving rise to Mathis' claims. ECF 26. On February 26, 2019, the court received correspondence from defendants indicating that they do not possess videos of the incidents in question as they had been "recorded over before suit was filed." ECF 28. The court construed defendants' correspondence as a renewal of their Motion, and granted Mathis additional time to respond. ECF 30. In March 2019, the court received correspondence from Mathis alleging that defendants are lying about the availability of the video footage in question. ECF 31; ECF 32. Defendants did not reply.

The matter is now ripe for disposition.[1] Upon review of the record, exhibits, and applicable law, the court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). Defendant SCDC shall be dismissed and defendants' renewed Motion shall be granted.[2]

## I. Factual Background

At the relevant time, Mathis was a pretrial detainee at SCDC. *See* Commitment Pending

---

[1] On September 4, 2019, the court received correspondence from Mathis requesting to "settle this matter." ECF 35. Although the parties are free to enter into settlement discussions at any time, the court cannot compel settlement discussions. *See Hodge v. Stephens*, No. 12-CV-01988-AW, 2013 WL 398870, at *17 (D. Md. Jan. 31, 2013), *aff'd*, 533 F. App'x 344 (4th Cir. 2013).

[2] In reaching this decision, the court does not rely on the parties' arguments regarding the availability of the video footage. Rather, the court has considered both parties' pleadings and exhibits and the sworn affidavits submitted by defendants.

Hearing, ECF 17-3.[3]  In his Complaint, Mathis claims that defendants used excessive force against him during incidents on December 1, 2017, December 11, 2017, and January 11, 2018.  Complaint, ECF 1 at 3-6.  In addition, he claims that Warden Hickman has discriminated against him and allowed SCDC staff to abuse him.  *Id.* at 4-5.

First, Mathis alleges that on December 1, 2017, following an altercation at approximately 1:30 p.m., four correctional officers restrained him.  *Id.* at 3.  According to Mathis, two of those officers slammed him on his bed with his arms underneath him.  CO II Bahamonde then asked him to put his hands behind his back, and when Mathis said that he could not, Bahamonde tased him and hit him "with the drive stun."  *Id.* at 3-4.

Defendants do not dispute that Corrections Officers II Bahamonde, M. Bozeman, E. Phillips, and S. Ridgeway responded to Mathis on December 1, 2017.  *See* ECF 17 at 4-5.  According to defendants, the officers headed to the rear of the Master Control Room after hearing Mathis banging on the door in an aggressive manner.  *See* Infraction Report, ECF 17-6; Bahamonde Affidavit, ECF 17-7.  Bahamonde states that Mathis told the officers he was "going to be a problem" if he did not get his shower and promised to start a fight.  *Id.*  Based on Mathis' threats, Bahamonde opened Mathis' cell door, withdrew his X-26P Taser from its holster, and ordered Mathis to put his hands behind his back.  *Id.*  Mathis refused to comply and instead stated that his shirt was wet so he could not be tased.  *Id.*  The officers tried to get Mathis' hands behind his back but Mathis physically resisted and prevented them from doing so.  *Id.*  Bahamonde then discharged his taser to Mathis' back, moved forward, and directly applied the taser to Mathis' back (*i.e.*, drive stun).  *Id.*  Mathis continued to resist and remained combative but was subsequently handcuffed by the officers.  *Id.*  The officers then escorted him to the processing area where he

---

[3] All citations reflect their electronic pagination.

was placed into a holding cell. *Id.* Mathis threatened to "slap" Bahamonde if he ever saw him on the street and stated that he would "Street Charge" for him "happily." *Id.* Mathis was placed in the portable restraint chair to end his threatening behavior and to protect staff and himself. *Id.* He was examined and cleared by medical staff and later returned to his cell. *Id.*

Mathis next claims that on December 11, 2017, while he was out for recreation at approximately 3:05 p.m., he asked Officer Kato for a towel to use after his shower. ECF 1 at 4. Mathis states that Kato told him he would ask another officer to bring it because he was working "master control." *Id.* At approximately 3:50 p.m., Mathis had not received his towel and he asked other officers about it. *Id.* According to Mathis, the officers told him to lock up because his recreation time was up. *Id.* Mathis alleges that Kato then grabbed him by the arm, followed by a choke hold, and slammed him to the floor. *Id.* According to Mathis, Kato began banging his head into the wall, slamming his face into the floor, and punching him in the head and ribs. *Id.* Mathis states that he sustained bruised ribs and knots on his head and face as a result. *Id.*

Defendants do not dispute that Officer Kato was working in the Master Control Room on December 11, 2017. *See* ECF 17-1 at 5. In his Affidavit, Kato stated that during that afternoon, he remotely opened the door to F-block to allow another inmate to go to the Medical Unit. *See* Infraction Report, ECF 17-8; Kato Affidavit, ECF 17-9. After the inmate exited, Mathis held the door open and refused to allow it to close. *Id.* Mathis was ordered to enter the block several times but refused to go in. *Id.* Thereafter, Kato called down to processing and informed Officer Ross McIntyre, the Officer-In Charge, that Mathis was refusing to allow the main door to F-block to be closed. *Id.* McIntyre directed Corrections Officer II Lisa Stacy to report to the Control Room and ordered Kato to come down to the floor. *Id.* Officers Kato, McIntyre, and Tyler then collectively ordered Mathis to "lock-in" three separate times but he refused. *Id.*

Subsequently, Kato grabbed Mathis' elbow and said, "Come on and lock-in!" *Id.* Mathis instead tensed his body and made a fist. *Id.* Kato quickly ordered Mathis to put his hands behind his back so that he could be handcuffed. *Id.* When Mathis pulled away, Kato placed him in a bear hug and took him to the floor with assistance from the other officers. *Id.* Kato held Mathis down while the other officers handcuffed him. *Id.* The officers then escorted Mathis to the Interview Room, placed him inside, and locked him to the restraint bar on the wall, for the officers' safety as well as his own. *Id.* According to Kato, medical staff were notified and Mathis was later medically cleared by HSA Montre Brown. *Id.* After being seen by medical, Mathis threatened the officers, saying that he would "shoot them with a gun" when he got out, that he lived nearby, and he "would find [them]." *Id.* Mathis was later returned to his cell and kept on lockdown, which had already been ordered because of another incident. *Id.*

Mathis claims that on January 5, 2018, he wrote Warden Hickman to ask why he was sanctioned for rules that other inmates violate and for which they receive no consequences. ECF 1 at 4. Mathis alleges that Warden Hickman has discriminated against him because the Warden's response on January 8, 2018 stated, "it is none of your concern or any of your business." *Id.* Mathis attached a copy of that correspondence as an exhibit. ECF 14 at 2. The Warden stated in the letter that SCDC staff took Mathis off lock down early last time and informed him that if his behavior did not improve, he would not be given any special attention. *See id.* According to the Warden, Mathis not only "mess[ed] up on the blocks [he] received another infraction while on lock down" and, therefore, SCDC staff may look at his request to be removed from lock down at a later date. *Id.*

Mathis' final claim relates to an incident that took place on January 11, 2018. ECF 1 at 5-6. He claims that at approximately 6:20 a.m., Officer Matthews came to his cell to deliver

breakfast but would not hand over Mathis' juice. *Id.* According to Mathis, Matthews left the cell door open and instructed Mathis to "go get [the juice]." *Id.* CO II Torney then came by and asked Mathis to go back into his cell. *Id.* Mathis states that after he entered his cell, Torney followed, locked the door, then drive stunned him in the arm with a taser. *Id.* When Mathis asked to see a supervisor, Torney directed him to "cuff up." *Id.* Torney then tackled Mathis with the help of two other officers, dragged him out of the cell, and placed him in a holding cell next to the nurse's station. *Id.* Mathis claims that he asked for medical attention while sticking his arm out of a slot, but Officer Matthews drive stunned him again. *Id.*

Defendants do not dispute that Officer Matthews delivered a food tray to Mathis on the morning of January 11, 2018. *See* Torney Narrative, ECF 17-10; Matthews Affidavit, ECF 17-12. When the door to the block opened, Matthews entered and handed Mathis his tray. Mathis then proceeded to walk past Matthews, holding his tray in one hand and two empty cups in the other. *Id.* Matthews twice ordered Mathis to stop, but Mathis continued to walk away. *Id.* Matthews took hold of Mathis' right arm and escorted him back to his cell. *Id.* Once Mathis was in his cell, he handed the empty cups to the officer and began shouting. *Id.*

At that time, Officer Torney, who had been in the Control Room, came into the block and told Mathis to back up. *Id.*; *see also* Incident Report, ECF 17-11; Torney Affidavit, ECF 17-12. Torney repeatedly told Mathis to back up and Mathis finally complied. *Id.* Torney told Mathis to give him the tray and that he would ensure that Mathis got his juice. *Id.* While Torney was placing the tray in the dayroom, Mathis moved forward so that half of his body was outside of the cell. *Id.* Torney ordered Mathis to go back into the cell, but Mathis refused. *Id.* Despite repeated commands, Mathis refused to move and became more aggressive, tensing his body and directly facing Torney. *Id.* Torney grabbed Mathis' shoulder and pushed him into the cell towards the

bunk, while Officers Matthews and Phillips stepped in to assist in handcuffing him. *Id.* Once Mathis was handcuffed, he was escorted to the processing area, during which time he remained combative, flipping over a mop bucket and a stack of food trays, and causing Officer Phillips to fall to the floor. *Id.* Once the officers reached processing, Mathis attempted to enter the Nurse's Office, but was held back. *Id.* The officers placed Mathis in the holding cell and reported the incident. *Id.*

Each of the above incidents resulted in a separate Notice of Infraction, as well as separate Use of Force Reports. As to the first incident, the Infraction Hearing was held on December 5, 2017, and was conducted by Officer Travis Whittington. *See* Notice of Infraction, ECF 17-14; Adjustment Hearing, ECF 17-15, 17-16; Infraction Report, ECF 17-17. Mathis was found guilty of violating rules 1 (assault), 7 (threats), 8 (resisting/interfering), 17 (disobeying an order), and 21 (disrespect). *Id.*; *see also* SCDC Inmate Handbook, ECF 17-5.

The second Infraction Hearing, held on December 13, 2017, was conducted by Lieutenant Bruce Parkinson. *See* Notice of Infraction, ECF 17-18; Adjustment Hearing, ECF 17-19, 17-20; Infraction Report, ECF 17-21. Mathis refused to appear at the hearing and the waiver form, which Mathis refused to sign, was completed by staff. *Id.* Mathis was found guilty of the infractions and, as discipline, he received 110 days on lockdown. *Id.*

The third hearing, held on January 16, 2018, was also conducted by Lieutenant Parkinson. *See* Notice of Infraction, ECF 17-23; Adjustment Hearing, ECF 17-24, 17-25; Infraction Report, ECF 17-26. Mathis again received discipline in the form of lockdown. *Id.*

Mathis' medical records do not indicate that he sustained any significant injuries in his altercations with the officers. *See* ECF 17-27. On December 1, 2017, a nurse noted that Mathis' bruises from the taser were cleaned and bandaged, and that Mathis "d[id] not have any complaints"

at the time. *Id.* at 1-2. Mathis was checked for bruises and, while restrained in the portable restraint unit, his respiration was monitored and his range of motion was checked upon release from restraint. *Id.* He was then cleared to shower. *Id.* On December 12, 2017, Mathis was prescribed Motrin and directed to apply ice to the taser-contacted area for two days. *Id.* at 3. Mathis was also seen by medical staff on January 18, 2018, for reasons unrelated to the incidents at issue here. *Id.*; *see* ECF 17-1 at 8 n.2 (stating that any information contained in the medical records that is unrelated to Mathis' claims has been redacted).

Each use of force was reviewed by Warden Hickman. *See* Use of Force Reports, ECF 17-28, 17-29, 17-30. As to each incident, he found "the use of force was justified as outlined by the Policy of the Somerset County Detention Center in preventing injury to the inmate and the destruction of property." *Id.*

On February 15, 2018, Mathis was transferred from SCDC to the Division of Correction. *See* Commitment Record, ECF 17-31.

## II.    Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable

opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. Appx. 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954,

961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion

when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x. at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. Appx. at 638.

Mathis has not filed an affidavit under Rule 56(d). With the exception of SCDC, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, as this will facilitate resolution of the case. As to SCDC, I shall construe the Motion as one to dismiss under Rule 12(b)(6).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, ___, 135 S. Ct. 346, 346 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of*

*the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

As to all claims, I am mindful that Mathis is self-represented. Therefore, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III.    Discussion

In their Motion, defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. They argue that (1) SCDC is not a proper defendant in a § 1983 action; (2) defendants did not use excessive force; (3) Warden Hickman is not a proper defendant; and (4) defendants are entitled to qualified immunity. ECF 17-1.

### 1. Somerset County Detention Center

Section 1983 of Title 42 of the United States Code provides: "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." (Emphasis supplied). *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied,* 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that

the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

As a preliminary matter, SCDC is not a "person" subject to suit under 42 U.S.C. § 1983. Several courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law and are not subject to suit under § 1983. *See Smith v. Montgomery Cty. Corr. Facility*, Civil Action No. PWG-13-3177, 2014 WL 4094963, at *3 (D. Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); *Preval v. Reno*, 57 F.Supp.2d 307, 310 (E.D. Va. 1999) (stating that "the Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983"); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1301 (E.D. N.C. 1989) (noting that "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit").

Conduct amenable to suit under 42 U.S.C. § 1983 must be conduct undertaken by a person. SCDC is not a person within the meaning of the statute. Therefore, Mathis' claims against SCDC must be dismissed. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978) (noting that for purposes of § 1983 a "person" includes individuals and "bodies politic and corporate"); *see generally* 5 Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 1230 (2002).

## 2. Excessive Force

As noted, plaintiff was a pretrial detainee at the relevant time. The Due Process Clause of

the Fourteenth Amendment protects the rights of pretrial detainees. *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992); *see also Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating, *inter alia*, that if the defendant "was a pretrial detainee rather than a convicted prisoner, then the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to *detainees* who require it'") (emphasis added in *Brown*) (citation omitted). Thus, "[p]retrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983)); *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Patten v. Nichols,* 274 F.3d 829, 834 (4th Cir. 2001). In other words, "[t]he constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." *Barnes v. Wilson*, 110 F.Supp.3d 624, 629 (D. Md. 2015) (citing *Bell*, 441 U.S. at 535); *see Brown v. Harris*, 240 F.3d at 388 ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)).

In *Graham v. Connor*, 490 U.S. 386 (1989), the touchstone case with respect to excessive force claims under § 1983, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393. The Court held that claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures; claims of excessive force against a convicted prisoner are governed by the Eighth Amendment's prohibition of "cruel and unusual punishment"; and claims of post-arrest excessive force against an arrestee or pretrial

detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits "the use of excessive force that amounts to punishment." *Id.* at 394 & n.10.

The contours of a prisoner's constitutional right to be free from excessive force at the hands of corrections staff has long been established. As the Fourth Circuit recently reiterated in regard to an Eighth Amendment excessive force claim, such a claim "involves both an objective and a subjective component." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). The objective component does not set "a high bar," and "asks whether the force applied was sufficiently serious to establish a cause of action." *Id.* The subjective component "asks whether the officers 'acted with a sufficiently culpable state of mind[.]'" *Id.* (Citation omitted). And, "this is a demanding standard." *Id.*

Whether force used by prison officials was excessive is determined by inquiring if the "'force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.'" *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

Notably, the absence of significant injury is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). If "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. In that circumstance, "no particular extent of physical injury is required to establish an excessive force claim . . . ." *Sawyer v. Asbury*, 537 Fed. App'x 283, 290 (4th Cir. 2013). On the other hand, "'not every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9).

The "state of mind required . . . is 'wantonness in the infliction of pain.'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 322). As indicted, this "turns on

whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21 (internal quotation marks omitted). In this regard, the court must consider the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Id.* at 321; *see Iko*, 535 F.3d at 239.

The extent of injury is one factor indicative of whether the force used was necessary in a particular situation. But, if force is applied "gratuitously," maliciously, or sadistically, liability is not avoided simply because the prisoner had "the good fortune" to escape serious harm. *Wilkins*, 559 U.S. at 38 ("[A]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.") And, only something more than de minimis force is required. *Hudson*, 503 U.S. at 10; *see Brooks*, 924 F.3d at 112.

Mathis claims that the correctional officers used excessive force against him while he was detained at SCDC. The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." __ U.S. __, 135 S. Ct. 2466, 2473 (2015). It is enough that a pretrial detainee shows that the "force purposely or knowingly used against him was objectively unreasonable," *id.*, regardless of an officer's state of mind. *Id.* at 2472 (cited in *Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016)). Pursuant to *Kingsley*, this court must consider whether, under the "facts and circumstances" of this particular case, and from the "perspective of a reasonable officer on the scene," the force used against plaintiff was objectively excessive. *Kingsley*, 135 S. Ct. at 2473.

Here, Mathis claims in an unverified Complaint that Officers Bahamonde, Kato, Torney, and Matthews used excessive force on three separate occasions when they tased him, banged his head into the wall and floor, and beat him while his hands were cuffed. Although this court is mindful that the absence of injury is not dispositive of an excessive force claim, there is no evidence that an assault occurred. Mathis has presented unverified, bald allegations. Notably, Mathis has not addressed defendants' sworn affidavits stating that Mathis refused to comply with their instructions and instead became combative when they tried to restrain him. Based on the record, it appears that defendants did not apply unreasonable force. Rather, they acted in a good faith effort to maintain or restore discipline at SCDC. Applying the *Kingsley* factors, the objective, verified evidence refuting Mathis' claim supports the conclusion that defendants are entitled to summary judgment.

### 3. Warden Hickman

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Warden Hickman is immune from suit for actions taken in his official capacity.

As to actions taken in his individual capacity, Mathis' sole allegation is that Warden Hickam discriminated against him by upholding his placement on lockdown. The Equal Protection Clause generally requires the government to treat similarly situated people alike. *Cleburne v.*

*Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated, a plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful. *See Williams v. Bitner*, 307 Fed. App'x. 609, 611 (3d Cir. 2009) (citing *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985)). The key to an equal protection claim requires a showing "that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1027, 1051-52 (8th Cir. 1998).

Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause . . . . must still be analyzed in light of the special security and management concerns in the prison system." *Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2001) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.").[4]

As previously noted, Mathis has presented unverified, bald allegations in this case. In any event, Mathis has failed to show that the alleged disparate treatment he received from Warden Hickman was intentional or purposeful. In an exhibit submitted by Mathis, Warden Hickman explained that he denied Mathis' request to be removed from lock down because he previously took Mathis off lock down early last time and warned him that he would not be given special

---

[4] A prisoner's rights under the Constitution are evaluated in light of his or her status as a prisoner. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 409-10 (1989).

attention if his behavior did not improve. ECF 14 at 2. Mathis then "mess[ed] up on the blocks" and subsequently "received another infraction while on lock down." *Id.* Warden Hickman is therefore entitled to summary judgment on Mathis' discrimination claim.

Moreover, Warden Hickman cannot be held liable simply because he occupied a supervisory position, because the doctrine of respondeat superior does not apply to § 1983 claims. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor has actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.*; *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Mathis has not shown that his constitutional rights were violated. In addition, his assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (stating that "[g]enerally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse"). At best, the Complaint and evidence establish that there are policies in place at SCDC to ensure that inmates follow the rules

set out in the Inmate Handbook, in order to maintain the safety of both staff and prisoners.  Non-adherence to the procedures does not amount to participation in the alleged constitutional violation sufficient to confer liability.

### IV.    Conclusion

Suit shall be dismissed as to defendant Somerset County Detention Center.  As to the remaining defendants, no genuine issue as to any material fact is presented and they are entitled to judgment as a matter of law.[5]

A separate Order follows.

<u>October 8, 2019</u>                             _____/s/_____
Date                                                Ellen L. Hollander
                                                United States District Judge

---

[5] In light of the court's ruling, an analysis of defendants' argument invoking qualified immunity is not necessary.